**Michael COLLINS, Plaintiff,**

**v.**

**OUTBOARD MARINE CORPORATION, Defendant.**

**Civ. No. 91–CV–4313.**

United States District Court, N.D. Illinois.

Aug. 17, 1992.

---

Craig Edgar Anderson, Charles James Corrigan, Jacobson, Brandvik & Anderson, Chicago, IL, for plaintiff.

Bruce R. Alper, Richard H. Schnadig, James J. Zuehl, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

Plaintiff, Michael Collins ("Collins"), has brought this action against defendant, Outboard Marine Corporation ("OMC"), pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, alleging that he was terminated as vice president of OMC's European Operations because of his age. The parties are now before the court on defendant's motion for summary judgment.

### BACKGROUND

Plaintiff was involuntarily retired from his position with International Harvester Company ("Harvester") in 1987, where he had held a variety of sales, marketing and managerial positions. After his retirement from Harvester, plaintiff briefly operated his own consulting firm. During that period, plaintiff was in contact with Dennis Jacobson ("Jacobson"), a former Harvester employee working at OMC. Those contacts eventually resulted in OMC hiring plaintiff as a $500.00 per day consultant on February 23, 1988.

Plaintiff provided consulting services for OMC in Australia and Europe throughout 1988. By September 29, 1988, it was decided that plaintiff would become Managing Director of OMC European Subsidiaries ("OMC Europe"). Plaintiff officially as-

sumed that position on November 1, 1988, and reported directly to Jacobson.

By mid–1989, Jacobson expressed his disappointment over the performance of OMC Europe. As a result, plaintiff and Owe Jansson, the past head of OMC Europe, drafted a proposed reorganization plan (the "plan"). Under the plan, OMC Europe was restructured by creating two marketing divisions reporting directly to the president of OMC Europe, one for boats (the Boat Division) and the other for engines (the Marine Power Division).

The original expectation was that plaintiff would be made president of the newly reorganized OMC Europe operation. Jacobson, however, concluded that plaintiff lacked the necessary skills for the top job, and instead selected OMC Comptroller, James Maurice, a man in his mid–50's, to head the operation on an interim basis. Meanwhile, plaintiff assumed responsibility for the Marine Power Division. George Lamy ("Lamy"), age 49, was plaintiff's counterpart as vice president of the Boat Division.

At about the same time, Jacobson began looking for a new president for OMC Europe. In June, 1990, Jacques Germay ("Germay") was selected for the position. Germay was told by Jacobson to turn OMC's Europe operations around even if it required another reorganization. After evaluating operations, Germay decided to again restructure OMC Europe, this time abandoning the recently established divisional structure and cutting staff. As a result, both plaintiff's and Lamy's positions were eliminated, and replaced by a new corporate marketing vice president position responsible for all product lines. Germay decided to retain Lamy for that position, and plaintiff was told of his termination on November 21, 1990. According to plaintiff, Germay told him that he was selected for termination because he was "retired, on pension and older" than Lamy. Germay denies having referred to plaintiff's age in relationship to Lamy. At the time of his termination, plaintiff was 60 years old.

On November 23, 1990, plaintiff met with OMC Europe Counsel, Andre Decraene ("Decraene"). Plaintiff asked Decraene to prepare an initial draft of a separation agreement. During the next several weeks, plaintiff and Decraene met to negotiate further the terms of the separation. On December 10, 1990, the final separation agreement ("agreement") was executed by the parties. It contained the following provision:

Parties acknowledge that this agreement is a settlement agreement. Mr. Collins and OMC, including any and all subsidiaries and affiliates, therefore renounce to any and all claims, rights, or court actions, which they might have, invoke, avail themselves of, or initiate against each other arising out of the performance or the termination of their employment relationship, without prejudice to the enforcement of this agreement.

Def. ex. 18, ¶ 10. In addition, plaintiff sought and obtained a provision which stated:

It is recognized by OMC that Mr. Collins performed his assigned duties in a competent, diligent, professional and honest manner. Further, that the termination of the employment agreement is the consequence of a reorganization which resulted in the elimination of his position as Vice President Marine Power Division.

Def. ex. 18, ¶ 11. Under the agreement, plaintiff received six months severance pay, totaling $51,650.

On January 25, 1991, Decraene approached plaintiff and asked him to sign a supplemental agreement containing an explicit release of claims under the ADEA and other employment laws. Plaintiff told Decraene that he had already signed an agreement and refused to sign the supplemental agreement. Decraene again approached plaintiff on January 28, 1991, explaining that plaintiff might be able to sue OMC if he did not sign the supplemental agreement. Plaintiff responded that it was not his style to sue anybody and that he intended to live up to the agreement as executed. On January 29, 1991, plaintiff wrote Decraene to complain about the threatening tone which plaintiff felt Decraene had used during their meeting, and

again questioned the need for a supplemental agreement.

After returning to the United States, plaintiff met with F.J. Short ("Short"), OMC's Vice President of Employee Relations. Plaintiff reiterated his intent to honor the December 10 agreement, and Short explained that the supplemental agreement OMC now sought was required under a recent amendment to the ADEA. Short subsequently sent plaintiff a letter detailing OMC's concerns:

> I am sorry the actions of others offended you. Our philosophy in providing a "better than policy" separation agreement is to facilitate an amicable separation and to preclude later legal action by the employee. If we can't obtain that kind of commitment from you and remain exposed to some sort of action anyway, it doesn't make much sense to provide additional consideration in the form of extended benefits.

> I repeat, Mike, we'd like to make this separation an amicable one and would appreciate if you would sign off on the Agreement required by the Older Worker's Benefit Protection Act.

Def. 12(m) stmt., ¶ 35.

On February 20, 1991, plaintiff received a copy of the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f), from Short. Plaintiff subsequently consulted with attorneys concerning his rights under United States law. This was apparently the first time plaintiff had consulted with a lawyer concerning his rights under United States law. However, while the December 10 agreement was being negotiated, plaintiff did consult with a Belgian lawyer concerning his rights under Belgian law.

On March 3, 1991, plaintiff received the severance pay negotiated under the December 10 agreement. On May 8, 1991, plaintiff filed an Equal Employment Opportunity Commission charge against OMC claiming that he was terminated because of his age. The present lawsuit was filed on June 11, 1991.

## DISCUSSION

Defendant raises a number of arguments in support of its motion for summary judgment. First, defendant argues that plaintiff has knowingly and voluntarily released all claims against OMC, including the present ADEA claim, by executing the release contained within the December 10 agreement. Alternatively, defendant argues that should the court find the release technically defective, plaintiff ratified the agreement by accepting consideration for it. Third, defendant argues that plaintiff is independently estopped from seeking relief under the ADEA because he led OMC to pay separation benefits by stating that he would not sue OMC. Finally, defendant contends that plaintiff has failed to produce evidence that he was terminated because of his age.

### 1. Older Workers Benefit Protection Act

██ The OWBPA became effective October 16, 1990, as an amendment to the ADEA. In relevant part, it provides the following:

> (1) An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum—

> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;

> (B) the waiver specifically refers to rights or claims arising under this chapter;

> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;

> (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;

> (E) the individual is advised in writing to consult with an attorney prior to executing the agreement;

(F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or

(ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;

(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;

\* \* \* \* \* \*

(3) In any dispute that may arise over whether any of the requirements, conditions, and circumstances set forth in [the above subparagraphs] have been met, the party asserting the validity of a waiver shall have the burden of proving in a court of competent jurisdiction that a waiver was knowing and voluntary pursuant to [the above subparagraphs].

29 U.S.C. § 626(f).

There is no question that the agreement executed by plaintiff and OMC fails to meet the requirements spelled out in the OWBPA. The agreement is deficient in at least the following respects: 1) it makes no mention of plaintiff's rights under the ADEA; 2) plaintiff was not given at least 21 days within which to consider the agreement; and 3) plaintiff was not advised in writing to seek legal counsel regarding his rights under the ADEA. Defendant does not attempt to argue that the release is in technical compliance with the statute. Rather, defendant contends that the release was knowing and voluntary, and cites to a number of decisions where general releases were enforced by the courts. *See Riley v. American Family Mutual Ins. Co.*, 881 F.2d 368, 372–73 (7th Cir.1989) (suit brought under Title VII); *Ulvin v. Northwestern Nat'l Life Ins. Co.*, 943 F.2d 862, 867 (8th Cir.1991); *Lancaster v. Buerkle Buick Honda Co.*, 809 F.2d 539, 540

(8th Cir.), *cert. denied*, 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987).

The problem with defendant's argument is that the releases in the above cases were all executed before the effective date of the OWBPA. Under the OWBPA, a release cannot be deemed knowing and voluntary unless all of the technical requirements of the OWBPA have first been satisfied. *See* 29 U.S.C. § 626(f)(1). Here, it is undisputed that at least three of those requirements have not been met. Therefore, the release is invalid as to plaintiff's ADEA claim.

### 2. Ratification

■ Defendant also argues that plaintiff should be prevented from pursuing his ADEA claim because he accepted separation benefits under the agreement. This argument is faulty. To begin with, the court has just determined that the executed release is invalid as to plaintiff's ADEA claim. That is tantamount to a determination that the scope of the release does not encompass a claim under the ADEA. If the release does not encompass the ADEA claim, the consideration received by plaintiff was not in exchange for relinquishing that claim. Rather, the separation benefits were received in exchange for those claims which plaintiff did, in fact, legally relinquish under the release. A cause of action under the ADEA was not one of those claims.

Defendant argues that *Grillet v. Sears, Roebuck & Co.*, 927 F.2d 217, 220–21 (5th Cir.1991) requires a different result. In *Grillet*, a pre-OWBPA case, the court held that the plaintiff had ratified the release by retaining the benefits tendered to her under the release. In so holding, the court stated that "[a] party cannot be permitted to retain the benefits received under a contract and at the same time escape the obligations imposed by the contract." *Grillet*, 927 F.2d at 220.

The key language in *Grillet* vis-à-vis ratification is "obligations imposed." The concept of ratification, like any other legal doctrine, does not exist in a vacuum; it demands a legal obligation which can be ratified. In *Grillet*, there was no question that the release, signed before the effective

date of the OWBPA, was broad enough to include a general release of employment claims. The problem with the release, and the reason it was voidable (although in that case not properly voided), was that it was executed in reliance upon a misrepresentation and under extreme time pressure. 927 F.2d at 219.

Here, the question is not the voidability of the release, but its scope. In this regard, the court finds that the benefits plaintiff received could not have been in exchange for the relinquishment of his rights under the ADEA, because federal law now provides that those rights cannot be relinquished without a specific reference to the ADEA in the written release.

Furthermore, were the technical deficiencies in the release not a *per se* bar to ratification, the facts in the record do not demonstrate that plaintiff intended to relinquish any potential claims under the ADEA when he executed the release. At that time, plaintiff was living in Belgium and working for the European subsidiary of an American corporation. He did not consult an American lawyer before signing the agreement, and was not advised by defendant to do so. Nor did defendant advise plaintiff verbally of his rights under the ADEA before he signed the agreement. Accordingly, there is no evidence that the separation benefits plaintiff received were in exchange for a release of his ADEA claim.

### 3. Estoppel

■ Next, defendant argues that plaintiff is estopped from pursuing his ADEA claim. According to defendant, separation benefits were paid to plaintiff in reliance upon his promise to live up to the agreement as executed. This argument is merely an attempt to do indirectly what the court has said defendant cannot do directly. The court has already ruled that plaintiff did not receive severance pay in exchange for relinquishing his ADEA claim. Plaintiff has kept his promise to abide by the

agreement as executed; unfortunately for defendant, the agreement as executed does not include a release from an ADEA claim. Defendant merely paid plaintiff what it was already contractually obligated to pay. As such, the payments were not made in detrimental reliance upon plaintiff's promise. *See Geva v. Leo Burnett Co., Inc.,* 931 F.2d 1220, 1223 (7th Cir.1991) (party may be estopped only where another has detrimentally relied upon a promise).

### 4. Proof of Discrimination

■ At the outset, the parties disagree as to what standard governs the analysis of plaintiff's discrimination claim. Defendant argues that the court should apply the mixed-motive analysis set forth in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1794, 104 L.Ed.2d 268 (1989).[1] Plaintiff, on the other hand, contends that the *McDonnell Douglas* burden-shifting analysis controls.

After reviewing the record, the court concludes that defendant's motion for summary judgment fails under either standard. Under *Price Waterhouse,* Germay's alleged statement to Collins that he was being terminated because he was "older" than Lamy constitutes direct evidence of age discrimination. Defendant contends that the phrase "older" referred to plaintiff's ability to qualify for pension benefits, a consideration which, in certain circumstances, may be non-discriminatory. According to defendant, the phrase "older" was "an isolated, descriptive remark by someone not terribly fluent in English." Defendant's memo at 18. While defendant may be correct, such a credibility judgment is inappropriate on summary judgment. Questions concerning Germay's intent are left for trial.

The same result accrues from the application of the *McDonnell Douglas* burden-shifting analysis. Defendant has articulated a non-discriminatory rationale for plaintiff's termination; namely, that Lamy was

---

**1.** Plaintiff correctly points out that the continued viability of the mixed-motive analysis in its current formulation has been called into question by Section 107(a) of the Civil Rights Act of 1991. *See Washington v. Lake County, Ill., et al.,* 969 F.2d 250, 255 n. 4 (7th Cir.1992). However, for purposes of this motion, the court applies the standard as spelled out in *Price Waterhouse.*

more qualified than plaintiff for the newly created corporate marketing position. Plaintiff, however, has produced evidence of pretext: an affidavit that Germay had commented that plaintiff was being terminated because he was "older." Again, whether that phrase in context is innocuous or pejorative is a question which the court cannot resolve on summary judgment. Accordingly, defendant's motion for summary judgment is denied.

## CONCLUSION

Defendant's motion for summary judgment is denied.

IT IS SO ORDERED.