Robert A. BUTCHER, Thomas H. Johnson, James Thomas and Daniel J. Velkovich, individually and as Class Representatives, Plaintiffs,

v.

GERBER PRODUCTS COMPANY, Defendant.

No. 98 Civ. 1819(RWS).

United States District Court, S.D. New York.

June 2, 1998.

308

Bernstein Litowitz Berger & Grossman, New York City, for plaintiffs; Daniel L. Berger, Darnley D. Stewart, of counsel.

Mandel & Resnik, New York City, for plaintiffs; Richard M. Resnik, David M. Monachino, of counsel.

Meyers Tersigni Feldman & Gray, New York City, for plaintiffs; Richard N. Gray, Anthony L. Tersigni, of counsel.

Orrick, Herrington & Sutcliffe, New York City, for defendant; Michael Delikat, Ira G. Rosenstein, of counsel.

Powell, Goldstein, Frazer & Murphny, Atlanta, GA, for defendant; John F. Wymer, III, Karen Wildau, Linda G. Birchall, Kathleen M. Timmons, of counsel.

*OPINION*

SWEET, District Judge.

Plaintiffs have moved for a preliminary injunction pursuant to Fed.R.Civ.P. Rule 65 prohibiting Defendant Gerber Products Company ("Gerber") from discontinuing any severance benefits to Plaintiff Daniel J. Velkovich ("Velkovich") and from seeking repayment of severance benefits which have already been paid to him. Plaintiffs have also moved pursuant to Fed.R.Civ.P. 12(f) to strike Gerber's Third Separate Defense, which asserts a defense of waiver. For the reasons set forth below, the motion for preliminary injunction is converted to a motion for summary judgment which is granted in favor of the Plaintiffs with leave granted for further submissions.

The issue presented is whether Plaintiffs have waived their right to assert a claim under the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 *et seq.* (the "ADEA"), by signing the Release and Waiver Agreement provided to them by Gerber ("Release"). Because the Release does not comply with the statutory requirements of the Older Workers Benefit Program Act, 29 U.S.C. § 626(f) (the "OWBPA"), and such noncompliance may not later be cured, the Plaintiffs are entitled to appropriate relief, including striking Gerber's defense of waiver.

### The Parties

The Plaintiffs are former employees of Gerber. They are all forty years of age and older. The four named Plaintiffs bring this suit on behalf of themselves and a class of approximately 325 former Gerber employees whom Gerber discharged by Notice of Termination dated January 9, 1998.

Plaintiff Robert A. Butcher ("Butcher") is a resident of Centereach, New York, and was employed as a National Account Manager for Gerber prior to his termination. Butcher was 53 years old when he was terminated and had been employed by Gerber for 33 years.

Plaintiff Thomas H. Johnson ("Johnson") is a resident of Mesquite, Texas, and was employed as a National Account Manager for Gerber prior to his termination. Johnson was 49 years old when he was terminated and had been employed by Gerber for more than 27 years.

Plaintiff James H. Thomas ("Thomas") is a resident of Shreveport, Louisiana, and was employed as a Senior Sales Representative for Gerber prior to his termination. Thomas was 47 years old when he was terminated and had been employed by Gerber for more than 18 years.

Plaintiff Velkovich is a resident of Allentown, New Jersey, and was employed as a National Account Manager for Gerber prior to his termination. Velkovich was 55 years old when he was terminated and had been employed by Gerber for more than 34 years.

Gerber, a subsidiary of Novartis, a Swiss-based company, is a Michigan corporation which maintains its headquarters in Fremont, Michigan. Gerber manufactures and distributes baby and infant food products, licenses and distributes branded apparel for children, manufactures sundry nursery accessories and infant care items, and licenses the manufacture of baby food products internationally.

### Prior Proceedings

On February 23, 1998, the named Plaintiffs, Butcher, Johnson, Thomas, and Velkovich, filed charges with the Equal Employment Opportunity Commission (the "EEOC"), alleging that their termination from Gerber was the result of age discrimination in violation of the ADEA. On March 11, 1998, they received their Notices of Right to Sue from the EEOC. On March 13, 1998, the named Plaintiffs filed this class action under the ADEA, seeking declaratory and injunctive relief, compensatory and liquidated damages, attorneys fees and other appropriate legal and equitable relief.

On April 24, 1998, Plaintiffs filed the motion for preliminary injunction by Order to Show Cause. Oral arguments were heard on May 14, 1998, at which time the Court invited the parties to submit any additional information they wished regarding whether a release and waiver that is defective under the OWBPA could be cured. Pursuant to the Court's request, Plaintiffs filed a supplemental memorandum of law on May 21, 1998, and Gerber

delivered its supplemental memorandum to the Court on May 29, 1998, at which time the motion was deemed fully submitted.

On May 19, 1998, an Order was issued by the Court to maintain the *status quo* until June 3, 1998; that is, Gerber was ordered not to terminate the severance benefits of any former Gerber sales associates before that date, and Gerber was to continue payment of Velkovich's COBRA health insurance premiums through that date or upon further Order of the Court.

*Facts*

### I. *The January Discharge and the Notice of Termination*

In January 1998, Gerber, citing the ongoing consolidation of accounts, the increasing role of technology, and the move toward centralized buying decisions which diminished Gerber's opportunity for selling to accounts locally, announced its decision to convert from a direct sales force to a broker sales force. As a result of this change, Gerber eliminated almost all of its direct sales positions and engaged the services of independent food and drug outlet brokers to undertake most of its sales and merchandising activities. Plaintiffs were discharged pursuant to this plan of reorganization of the sales force. According to Plaintiffs, the "reorganization" discriminated against older employees by intentionally and disproportionately targeting them for termination.

The sales associates whose positions were being eliminated received a package of materials which included, among other things, a Notice of Termination, dated January 9, 1998, explaining that if the associate signed the Release, the associate would receive a package of severance benefits for a minimum of three months, including severance pay and health insurance, and some associates would receive up to six months severance benefits, depending on their salary grade. Additionally, an associate could receive outplacement services or professional retirement planning, at the associate's choice, continuation of medical and dental coverage, spending accounts, basic life insurance, optional life insurance, and voluntary personal accident insurance coverage for a period coincident with the receipt of severance pay, pro rata vacation, and a special sales incentive payment plan developed specifically for the months of January and February 1998.

The severance benefits were available only to associates who signed the Release, and none of the benefits would otherwise have been provided to those associates whose employment was terminated. The Notice of Termination further explained that some benefits were available regardless of whether the Release was executed, such as unused vacation, the associate's vested Gerber Retirement Investment Plan account, and vested pension benefits. Gerber also notified each associate that he or she might be eligible for unemployment compensation, depending upon applicable state law, and that federal COBRA law provided the opportunity to continue medical and dental coverage for specified periods. The Notice of Termination further recommended that each associate should obtain legal advice from an attorney concerning the severance package and the Release during the 45-day period that each associate had to decide whether or not to sign the Release.

### II. *The Release and Waiver Agreement Provided to Discharged Employees*

The Release distributed to the terminated employees as part of their severance packages, provides, in relevant part:

Releasor agrees that the benefits provided pursuant to this Agreement are in full settlement of any and all claims, demands and actions, and causes of action whatsoever, which Releasor has or may have had as a result of employment and/or separation from employment with [Gerber] including, but not limited to, all claims asserted in, or which could have been asserted in a lawsuit, including but not limited to wrongful discharge, negligent evaluation and employment discrimination and any claims under the Age Discrimination in Employment Act of 1967, as amended, Title VII of the 1984 Civil Rights Act, as amended, the Americans with Disabilities Act, or any other federal, state or local laws or ordinances, including but not limited to those dealing with disability employment.

The Release further states that "[t]he invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect." In addition, the Release purports that

> all monies received under this Agreement will become immediately due and payable to [Gerber] if Releasor should ever breach any term of this Agreement. If the Releasor should ever file a lawsuit based on any legal claims Releasor has released, Releasor will pay for all costs and expenses incurred by the Company, including reasonable attorneys' fees, in defending such suit.

Velkovich was the only named Plaintiff in this action who signed the Release. Upon execution, he became entitled to six months of severance benefits beginning March 1, 1998. He subsequently accepted some of those benefits.

### III. *Plaintiffs' Filing of This Lawsuit and Gerber's Actions Against Velkovich*

On March 13, 1998, after receiving Notices of Right to Sue from the EEOC, the four named Plaintiffs filed this action. On March 31, 1998, Kristina Kiley ("Kiley"), Gerber's Vice President of Human Resources, notified Velkovich in writing that Gerber considered his filing of this action to be in violation of the Release, and that Gerber was suspending any further payments to him pursuant to the Release and was discontinuing other benefits provided under the Release, effective as of February 28, 1998. Gerber demanded that Velkovich return the severance monies already paid to him between March 1 and 15, 1998, and informed him that he would be receiving a formal notice of his rights under COBRA to secure health insurance. The reason given by Gerber for taking this action was that Gerber had been informed that Velkovich was a plaintiff in an age discrimination suit against it.

### IV. *Gerber's April 2, 1998, Letter to Discharged Employees*

On April 2, 1998, Gerber sent a letter to each of the discharged employees over the age of forty (the "April 2 Letter" or "Letter"). In the Letter, Gerber notified its former associates of the pendency of this action and the allegation that Gerber's decision to convert to a broker sales force violated the ADEA. The April 2 Letter provided information as to who was and was not separated from Gerber and offered a severance package pursuant to the sales force conversion. The information revealed that 265 of the 389 set forth on Gerber's list of those terminated were age forty or older and more than 165 were at least 50 years old at the time they were discharged.

The April 2 Letter provided the discharged employees with two options: either "reaffirm" their prior acceptance of the Release, or "revoke" it. Gerber attached a form entitled "Reaffirmation or Revocation of Acceptance of Release and Waiver Agreement" to be filled out and returned to Gerber. The Letter explained that:

> If, after reviewing this information, you decide that you want to continue to receive the additional benefits being provided to you, pursuant to the Release and Waiver Agreement, you should sign and date the "Reaffirmation of Acceptance".... If you decide not to reaffirm your earlier acceptance, you should sign and date the "Revocation of Acceptance".... If you revoke your acceptance, we will then discontinue any remaining benefits or payments that you would have otherwise received pursuant to the Agreement. Moreover, you will note that the Release and Waiver Agreement you previously signed states that you agree to repay to [Gerber] all money or other value you have received under the Agreement if you later seek to challenge the Agreement's enforceability. This would include any severance payments made to you and the value of all other benefits received or paid on your behalf. The Release and Waiver Agreement also says that you will have to reimburse [Gerber] for its costs and expenses, including its reasonable attorney fees, if you ever file a lawsuit against Gerber for any claims you released.

Finally, Gerber wrote:

While Gerber believes that your initial acceptance of the separation package is binding on both you and [Gerber], we believe that everyone who signed the Release and Waiver Agreement previously should have access to the information shared with other associates and be given the same opportunity to reconsider his or her decision in light of the enclosed information. We will respect your decision based on your own sense of what is right and wrong, whether you decide to reaffirm or revoke your previous acceptance.

Gerber claims that the April 2 Letter simply quotes the language of the Release and says nothing about terminating severance benefits to anyone who does not either reaffirm or revoke the Release. It further states that it does not intend to terminate severance benefits to former associates who neither revoke nor reaffirm, but only to those who join this action. However, as Plaintiffs point out, there is confusion regarding the rights of the discharged employees *vis-a-vis* the April 2 Letter, consequences of reaffirming the Release or not, and the rights of former employees to join this action. Since the parties, as well as the Court, discerned the existence of confusion during oral arguments on March 14, 1998, the Court requested submission by the parties of an Order clarifying the situation for the former employees. As of this writing, the proposed Order was in the making.

### Discussion

### I. *Conversion to Summary Judgment Motion*

Plaintiffs seek a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure prohibiting Gerber from discontinuing any severance benefits to Velkovich and from demanding repayment of severance benefits already paid to him under the Release which he signed. Plaintiffs assert that the Release is invalid because it failed to comply with the statutory requirements of the OWBPA, and that Gerber's actions against Velkovich constitute retaliation.

The standard for granting a preliminary injunction in this circuit is "(1) a showing of irreparable injury and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping in favor of the movant." *The Civic Ass'n of the Deaf of New York City, Inc. v. Giuliani,* 915 F.Supp. 622, 631 (S.D.N.Y.1996) (*citing Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994)).

The showing of irreparable harm is perhaps "the single most important prerequisite for the issuance of a preliminary injunction." *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990). Irreparable injury is one that cannot be redressed through a monetary award. Where money damages are adequate compensation, a preliminary injunction will not issue. *See JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990); *Giuliani,* 915 F.Supp. at 631. Monetary loss will not suffice unless the movant shows damage that cannot be rectified by financial compensation. *See Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989); *see also Jayaraj v. Scappini,* 66 F.3d 36, 38 (2d Cir. 1995) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (*citing Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974))).

Although Plaintiffs have shown a likelihood of success on the merits, in that if the Release is indeed invalid under the OWBPA and if Gerber may not cure the Release by the April 2 Letter, Plaintiffs who signed the Release may not be barred from pursuing their age discrimination claim under the ADEA. Moreover, Gerber's attempt to cut off severance benefits paid pursuant to the Release may constitute retaliation. The Plaintiff at issue is Velkovich because it is his benefits that Gerber proposes to curtail. Plaintiffs, however, have failed to demonstrate irreparable harm because Velkovich will suffer no more than monetary loss if

Gerber proceeds in its actions. Mere monetary loss is not a compelling reason for the extraordinary remedy of a preliminary injunction.[1] For this reason, a preliminary injunction is inappropriate.

Regardless, the preliminary injunction motion is moot because it is being converted *sua sponte* into a motion for summary judgment [2] on the issue of whether the Release is defective, and if so, whether the defectiveness was cured by Gerber's April 2 Letter. The validity of the Release bears on whether Plaintiffs who signed it effectively waived their right to bring suit under the ADEA against Gerber. If their right has been waived, then filing suit breaches the Release agreement and their severance benefits may be terminated. If their right has not been waived, no breach has occurred and Gerber must continue to provide the severance benefits it promised. Moreover, if the Release and April 2 Letter are invalid under the OWBPA, Gerber may not use the Release as an affirmative defense in this litigation.

During oral arguments on May 14, 1998, the Court requested supplementary information concerning this very issue—the validity of the Release and the possibility of "cure" by the April 2 Letter. Because the parties were not apprised of the conversion of this motion, they may, if they desire, submit further information, in which case the summary judgment decision will be reconsidered.

## II. *Standard for Summary Judgment*

Rule 56(e) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Silver v. City University*, 947 F.2d 1021, 1022 (2d Cir.1991).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988). If there is any evidence in the record regarding the issues on which summary judgment is sought from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *See Knowles v. New York City Dept. of Corrections*, 904 F.Supp. 217, 220 (S.D.N.Y.1995).

A party seeking to defeat a summary judgment motion cannot "rely on mere speculation or conjecture as to the true nature of facts to overcome the motion." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). Rather, the responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l Corp. v. Luna Records, Inc.*, 887 F.Supp. 560, 564 (S.D.N.Y.1995). In the absence of any disputed material fact, summary judgment is appropriate.

## III. *The Affidavit of Darnley D. Stewart*

Plaintiffs' counsel, Darnley D. Stewart has submitted an affidavit ("Stewart Affidavit")

1. According to Gerber, Velkovich was entitled to six months of severance benefits, including paid health insurance, when he signed the Release, after which time he would have been responsible for the payment of his own health insurance premiums under COBRA. Absent a preliminary injunction, Velkovich will be responsible for six months of COBRA payments, or approximately $2,600. Gerber contends that if Velkovich prevails in this litigation, he will be reimbursed for that amount and for the amount of the severance benefits to which he would otherwise have been entitled had he not "breached" his agreement with Gerber.

2. "Though not expressly authorized by Rule 56, this practice [of the district court independently raising and granting a summary judgment motion] has become an accepted method of expediting litigation." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

in support of Plaintiffs' motion for preliminary injunction. Gerber proposes that the Stewart Affidavit be stricken in its entirety because it fails to meet the evidentiary standards for submission of an affidavit under Rule 56.

Rule 56(e) provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated herein." Fed. R.Civ.P. 56(e).

Gerber asserts that the Stewart Affidavit is based only upon hearsay, speculation, legal conclusion, and argument, rather than upon facts and personal knowledge. Although this affidavit would be acceptable in a motion for preliminary injunction,[3] it does not fully comply with the "personal knowledge" requirement of Rule 56(e). Therefore, the representations that are not based on personal knowledge will not be considered in the instant motion for summary judgment. Given the affidavits submitted by Gerber and those of Velkovich and other former Gerber employees submitted by Plaintiffs, the Stewart Affidavit is not vital in determining whether summary judgment is warranted.

## IV. *There Is No Issue of Material Fact As to Whether the Release Is Invalid*

Summary judgment is granted to Plaintiffs because, as discussed below, the Release is invalid as a matter of fact and law. Furthermore, Gerber cannot cure the OWBPA violation by its supplemental April 2 Letter. Thus, Velkovich and the others who signed the Release are entitled to the severance benefits it offers, and they have not waived

their right to sue under the ADEA and OWBPA.

## A. *The January 1998 Release*

In 1990, Congress enacted the OWBPA as an amendment to the ADEA. The OWBPA mandates that an "individual may not waive [an ADEA claim] unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f)(1). The statute provides that a waiver must contain certain enumerated minimum information for it to be considered "knowing and voluntary." 29 U.S.C. § 626(f)(1)(A)–(H).

The United States Supreme Court recently held in *Oubre v. Entergy Operations, Inc.,* —— U.S. ——, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998), that because Congress delineated the specific minimum requirements for an ADEA waiver with "precision and without qualification," an "employee 'may not waive' an ADEA claim unless the waiver or release satisfies the OWBPA's requirements." *Id.* at ——, 118 S.Ct. at 841. The Court stated:

> The policy of the Older Workers Benefit Protection Act is likewise clear from its title: It is designed to protect the rights and benefits of older workers. The OWBPA implements Congress' policy via a strict, unqualified statutory stricture on waivers, and we are bound to take Congress at its word. Congress imposed specific [delineated] duties on employers who seek releases of certain claims created by statute.

*Id.*

Since the OWBPA establishes minimum or threshold requirements, absolute technical compliance with its provisions is required. *See Griffin v. Kraft Gen. Foods, Inc.,* 62 F.3d 368, 373 (11th Cir.1995). The absence of even one of the OWBPA's requirements invalidates a waiver. *See Collins*

---

**3.** Because the purpose of a preliminary injunction is only to preserve the *status quo* in a case until a trial can be held, and "given the haste that is often necessary if these positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than a trial on the merits.... A party is thus not required to prove his case in full at a preliminary injunction hearing." *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *see S.E.C. v. Musella,* 578 F.Supp. 425, 440 (S.D.N.Y.1984) (same); *see also*

*Federal Sav. & Loan Ins. Corp. v. Dixon,* 835 F.2d 554, 558 (5th Cir.1987) (holding that evidence presented in affidavit containing hearsay was admissible in preliminary injunction proceeding, relying on *Camenisch* ); *Moore's Federal Practice 3d* § 65.23[2] ("[t]he requirements of Rule 56(e) for affidavits in support of a motion for summary judgment are not expressly applicable to affidavits in support of a preliminary injunction.... The rationale for that is that since injunctive relief is discretionary and non-final, application of the standards for summary judgment affidavits would be inappropriate.").

*v. Outboard Marine Corp.,* 808 F.Supp. 590, 594 (N.D.Ill.1992) ("Under the OWBPA, a release cannot be deemed knowing and voluntary unless all of the requirements of the OWBPA have first been satisfied.").

In the OWBPA, Congress provided that when a release of claims is sought in connection with an "employment termination program" affecting "a group or class of employees," the employer must inform each eligible employee in writing of the job titles and ages of all individuals eligible or selected for the termination program and corresponding information relating to the employees in the same classifications who are not eligible or selected for the program. 29 U.S.C. § 626(f)(1)(H). Congress has found that the list of ages of those terminated and those retained is especially important:

> [E]arly retirees or employees offered the chance to participate in exit or incentive or other group termination programs can effectively be forced to waive their right to file a claim when the employer conditions such participation on the signing of a waiver. The problem is particularly acute in large-scale terminations and lay-offs, where an individual employee would not reasonably be expected to know or suspect that age may have played a role in the employer's decision, or that the program may be designed to remove older workers from the labor force.

*Long v. Sears Roebuck & Co.,* 105 F.3d 1529, 1534 (3d Cir.1997) (*quoting* S.Rep. No. 101–79, at 9 (1989), and adopted by reference in S.Rep. No. 101–263, at 15 (1990) U.S.Code Cong. & Admin.News, pp. 1509, 1520). Failure to comply with the provisions of § 626(f)(1)(H), requiring detailed information about the ages of those affected by the group termination, renders a purported release invalid as a defense to an ADEA claim. *See Long,* 105 F.3d at 1535–36.

▮ In the instant case, there is no dispute that the mass discharge of the vast majority of Gerber's sales force on one day in January constitutes an "employment termination program" under the OWBPA. Therefore, Gerber was required to provide the information required by the statute. Moreover, there is no dispute that Gerber did not provide Velkovich or any of the other similarly situated terminated employees with the information mandated by § 626(f)(1)(H) at the time it sought and obtained the Release from those employees. Thus, the Release relied upon by Gerber for terminating severance benefits due to Velkovich's participation in this litigation is invalid as it purports to release any claim for age discrimination under the ADEA.

▮ Gerber, not contesting its failure to comply with the OWBPA requirements, nonetheless asserts that it has a contractual right to terminate the severance payments to Velkovich because, due to his participation as a named plaintiff in this action, he is in breach of the Release agreement. After Velkovich signed the defective Release and joined this lawsuit, Gerber's Vice President of Human Resources, Kristina Kiley ("Kiley") sent him a letter dated March 31, 1998 (the "March 31 Letter"), which states:

> We have now been notified that you are a plaintiff in a lawsuit filed against Gerber Products based on alleged age discrimination. We consider your lawsuit to be in violation of our agreement and are, therefore, notifying you that Gerber has decided to suspend any further payments to you, and to discontinue any benefits under the agreement effective February 28, 1998. The severance dollars paid to you for the period of March 1, 1998 through March 15, 1998 must be returned to the Company immediately.

Plaintiffs correctly point out that given the plain language of the March 31 Letter, Gerber cannot deny that the conduct envisioned by the letter constitutes anything other than an act of retaliation solely because Velkovich engaged in the protected activity of commencing this ADEA action against Gerber. Under the Supreme Court's decision in *Oubre,* Gerber's termination of Velkovich's benefits and its demand that he return all funds received is contrary to the OWBPA.

The *Oubre* Court addressed whether, in the case of a release which failed to comply with the OWBPA, a terminated employee was required to "tender back" benefits previously received as a condition to proceeding

with an ADEA action. The employer in *Oubre* insisted that such a release barred an ADEA action "unless, as a precondition to filing suit, the employee tenders back the monies received." *Oubre,* —— U.S. at ——, 118 S.Ct. at 840. The majority of the Court, flatly rejected the employer's argument:

> The [tender back] rule proposed by the employer would frustrate the statute's practical operation as well as its formal command. In many instances a discharged employee likely will have spent the monies received and will lack the means to tender their return. These realities might tempt employers to risk noncompliance with the OWBPA's waiver provisions, knowing it will be difficult to repay the monies and relying on ratification. We ought not to open the door to an evasion of the statute by this device.

*Id.* at ——, 118 S.Ct. at 842. The Court concluded that the "statute governs the effect of the release on ADEA claims, and the employer cannot invoke the employee's failure to tender back as a way of excusing its own failure to comply." *Id.* Furthermore, according to *Oubre,* "[a]s a statutory matter," a release that does not comply with the "stringent safeguards" of the OWBPA "cannot bar [an] ADEA suit, irrespective of the validity of the contract as to the other claims." *Id.*

Gerber insists that the March 31 Letter does not suggest to Velkovich that his retention of previously paid severance benefits constitutes a ratification of the Release that would preclude his bringing this action. Indeed, Gerber cannot, in light of *Oubre,* make such a suggestion. The *Oubre* Court unequivocally found that "the employee's mere retention of monies [does not] amount to a ratification equivalent to a valid release of her ADEA claims, since the retention did not comply with the OWBPA any more than the original release did." *Id.* at 842. Rather, claims Gerber, it suggested to Velkovich in the March 31 Letter that "the fairest thing for both sides is to cease any further payments or benefits until the enforceability of the release can be resolved." The time of resolution is now at hand.

Conceding the Release violates the OWBPA, Gerber justifies its actions by relying on Justice Breyer's concurrence in *Oubre.* Yet, Gerber's contention that it is entitled to "self-help" is inapposite to the concurring opinion. As Gerber notes, Justice Breyer, whose concurrence was joined by Justice O'Connor, explained that a contract between employer and employee that fails to comply with OWBPA's requirements is not void but merely voidable. *Id.* at —— — ——, 118 S.Ct. at 843–44 (Breyer, J., concurring). He notes that characterizing the contract as voidable rather than void is important because if a former employee's procedurally invalid promise not to sue were absolutely void, it might become possible for an employer to cancel its own reciprocal obligation to pay the worker or provide ongoing health benefits, whether or not the worker ever intended to bring a lawsuit. Justice Breyer reasoned that it "seems most unlikely that Congress, enacting a statute meant to protect workers, would have wanted to create—as a result of an employer's failure to follow the law—any such legal threat to all workers, whether or not they intend to bring suit." *Id.* at ——, 118 S.Ct. at 844. To find the contract voidable would offer legal protection against those threats, and at the same time:

> could permit an employer to recover his own reciprocal payment (or to avoid his reciprocal promise) where doing so seems most fair, namely, where that recovery would *not* bar the worker from bringing suit. Once the worker (who has made the procedurally invalid promise not to sue) brings an age-discrimination suit, he has clearly rejected (avoided) his promise not to sue. As long as there is no "tender back" precondition, his (invalid) promise will not have barred his suit *in conflict with the statute.* Once he has sued, however, nothing in the statute prevents his employer from *asking for restitution* of his reciprocal payment or relief from any ongoing reciprocal obligation.

*Id.* at ——, 118 S.Ct. at 844 (second emphasis added).

Gerber clings to this language in defense of its actions. However, Justice Breyer did not state that an employer could "take" or

"withhold" payment in an act of self-help. By using the words "asking" and "restitution," Justice Breyer envisioned an employer asserting an appropriate defense or making an appropriate motion at the end of litigation. In fact, Justice Breyer specifically cites to four "older state" cases in support of this proposition—all of which involve "setting (a) remedy" or "credit against damages" after the fundamental issues in a lawsuit have been resolved.[4] *Id.* (noting that a "number of older state cases indicate ... that the amount of consideration paid for an invalid release can be deducted from a successful plaintiff's damages award"). Indeed, a "basic rule" of restitution is that the plaintiff first "establish[ ] a right to recover" before he or she "is entitled to recover that which he parted with, or, more specifically, that which the defendant has received." 22A N.Y.Jur.2d *Contracts* § 572 (1996).

Justice Breyer's point in this respect accords with the *Oubre* majority's statement that in "further proceedings in this or other cases, courts may need to inquire whether the employer has claims for restitution, recoupment, or setoff against the employee, and these questions may be complex where a release is effective as to some claims but not as to ADEA claims." *Id.* at ——, 118 S.Ct. at 842. Gerber has in fact asserted an affirmative defense for recoupment and setoff. *See* Gerber's Amended Answer, Eighth Separate Defense.

Any other reading of Justice Breyer's concurrence would contravene the policy of the OWBPA which is "designed to protect the rights and benefits of older workers," not to insulate employers such as Gerber. *Oubre,* —— U.S. at ——, 118 S.Ct. at 841. Gerber nonetheless asserts, relying on Justice Breyer's words, that Gerber is permitted to "avoid [its] reciprocal promise" because doing so "seems most fair." Yet, Gerber, in its

analysis, neglects to deal with the OWBPA and its purpose. To allow Gerber to terminate severance benefits by resorting to this form of self help would enrich employers at the expense of the older employees for whose benefits the OWBPA was enacted. The ability of an employer to cut off benefits by reason of the commencement of an ADEA action, even though the employer has not complied with the OWBPA, would encourage employers to violate the OWBPA while buying immunity from challenges to their discriminatory policies and practices. It would, as a practical matter, enable an employer by utilizing the coercive threat of cutting off agreed upon benefits, to prevent the assertion of ADEA claims, even though he is not entitled to such protection under statute.

Additionally, the void versus voidable issue addressed in Justice Breyer's concurring opinion need not be reached at this juncture because the parties contractually agreed in the Release that in the event that a portion of the Release is found to be "invalid[ ] or unenforceab[le] ... this shall not affect the validity or enforceability of any other provision of this Agreement...." The severability or savings clause contained in paragraph 9 of the Release, among other things, precludes Gerber or the terminated employees from disavowing the terms of the Release regardless of the enforceability of the agreement as to the ADEA.[5]

Here, Gerber does not claim that Velkovich (and others) breached the Release in any way other than commencing or joining this lawsuit, nor is there a claim that the Release is unenforceable except as to an ADEA claim. *See generally Branker v. Pfizer,* 981 F.Supp. 862, 867 (S.D.N.Y.1997) (an employer's "failure to comply with the OWBPA cannot invalidate release of [employees'] claims under the NYCHRL or NYSHRL, since the provisions of the OWBPA apply

---

**4.** The cases Justice Breyer cites are *St. Louis–San Francisco R. Co. v. Cox,* 171 Ark. 103, 113–115, 283 S.W. 31, 35 (1926) (amount paid for invalid release may be taken into consideration setting remedy); *Koshka v. Missouri Pac. R. Co.,* 114 Kan. 126, 129–30, 217 P. 293, 295 (1923) (the sum paid for an invalid release may be treated as an item of credit against damages); *Miller v. Spokane Int'l R. Co.,* 82 Wash. 170, 177–78, 143 P. 981, 984 (1914) (same); *Gilmore v. Western*

*Elec. Co.,* 42 N.D. 206, 211–12, 172 N.W. 111, 113 (1919).

**5.** Finding that the Release is merely voidable and not void will not change the instant result. Voidability would allow Gerber to assert its defense of recoupment and setoff, whereas a conclusion that the Release is void would not.

only to the ADEA and not to state law claims"). To the contrary, as Plaintiffs assert, Velkovich and Gerber's other former employees released a myriad of rights beyond the ADEA by executing the Release in exchange for the consideration they received. Moreover, the amount of severance the employer pays the employee "typically incorporates consideration for multiple factors not challenged in an age case: waivers for other violations of law or contract, rolled-in vacation and sick time, and a public relations benefit to the employer that itself may deter other litigation." *Long,* 105 F.3d at 1544.

Where, as here, the Release is ineffective only with respect to the ADEA, there is no legitimate basis for withholding all of the benefits an employee is due under the Release. Gerber has received benefit from the release it drafted, and a great windfall will not result to the discharged employees if Gerber is required to continue making severance payments to which they are contractually obligated.

According to Gerber, however, the discharged employees who signed the Release and who have joined in this lawsuit are receiving benefits they would not otherwise be entitled to absent the Release. While this is true with respect to the ADEA claims, given the policy behind the OWBPA and the Supreme Court's directive in *Oubre,* the inclination is toward penalizing the employer for its "mistake" of not complying with the statutory requirements set forth in the OWBPA, rather than depriving the employee of the protection afforded him or her under the statute.

### B. *The April 2 Letter Does Not Cure the Defects of the Release*

Having found the Release invalid under the OWBPA, the next question is whether Gerber "cured" the defective Release by issuing its April 2 Letter. This is a novel question, and the answer is no.

### 1. *As a Matter of Public Policy and Law, an Employer Is Allowed One Chance to Conform with the OWBPA Requirements*

A reading of the OWBPA and a study of the congressional intent behind the statute

foreclose a finding that cure of a defective waiver is permissible.

Statutory construction "must begin with the language of the statute itself," and "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Bread Political Action Committee v. FEC,* 455 U.S. 577, 580, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982) Additionally, a reading of a statute cannot be plainly contrary to the intent of Congress. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *see also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (stating that "first, always, is the question of whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the Court ... must give effect to the unambiguous expressed intent of Congress"); *Commissioner v. Engle,* 464 U.S. 206, 223, 104 S.Ct. 597, 78 L.Ed.2d 420 (1984) (noting that a court must be guided by the object and policy of the statute rather than by the language of a particular sentence or part thereof).

Section 626(f)(1)(H) provides, *inter alia,* that:

> if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to— ... (ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

Section 626(f)(1)(F)(ii) states that if such a waiver is requested, "the individual is given a period of at least 45 days within which to consider the agreement."

According to Plaintiffs, the OWBPA is clear and unambiguous: the information re-

quired by § 626(f)(1)(H) must be furnished to employees at the commencement of the 45–day period following the exit incentive or termination program, which in the present case began on January 9, 1998, when Gerber sent its Notice of Termination to the discharged employees and advised them that they had 45 days to consider the Release. Gerber's position, however, is that another 45 days commenced after the April 2 Letter. Gerber's position is without merit.

The statute is silent as to whether employers could have more than one opportunity to furnish all necessary information to employees. This silence is telling. The Supreme Court made it clear that "(t)he policy of the older Workers Benefit Protection Act is ... [the protection of] the rights and benefits of older workers." *Oubre*, —— U.S. at ——, 118 S.Ct. at 841. Congress' intent to protect older workers would be circumvented if employers were given more than one chance to comply with the OWBPA. If the statute were to allow employers two or more "bites of the apple," an employer could put off compliance indefinitely. It could obtain waivers from older workers without complying with the OWBPA in the hopes that the employees would not commence a timely ADEA action. If such an action were then commenced, as it was in this case, the employer could simply "comply" at that time and then raise the defense of release and waiver. Allowing an employer to "cure" after an ADEA claim has been filed hardly furthers the goals of the ADEA and the OWBPA. Gerber had its chance to comply, and that was on January 9, 1998.

Apart from the language contained in § 626 and its lack of directive permitting "cures," a review of the legislative history behind the enactment of the statutory scheme further demonstrates that permitting employers to cure an ineffective waiver contravenes congressional intent.

The legislative history of the OWBPA indicates that the fundamental purpose of its waiver provisions is to ensure that an older worker who is asked to sign an ADEA waiver does so in the absence of fraud, duress, coercion, or mistake of material fact. When Congress enacted the ADEA, it had in mind not only to provide benefits to victims of discrimination, but also to create incentives for companies to obey they law.

The Senate Labor and Human Resources Committee, which approved the ultimate version of the OWBPA, stated that the purpose of § 626(f)(1)(H)(ii) was to "permit older workers to make more informed decisions in group termination and exit incentive programs." S.Rep. No. 101–263, at 34 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1539. Without legislation, the Committee found, older workers in group or class terminations are generally unable "to determine whether the [termination] program gives rise to a valid claim under the ADEA." *Id.* This inability arises because employees affected by group or class termination programs have little or no basis to suspect that the decision is based on their individual characteristics.

The need for adequate information and access to advice before waivers are signed is especially acute in group termination situations because the Release and waiver is not a negotiated document but, rather, a one-sided "take it or leave it" document prepared by the employer. *See id.* at 23, 1990 U.S.C.C.A.N. at 1538. Indeed, the Senate Committee Report stresses that the requirements of the OWBPA "be strictly interpreted to protect those individuals covered by the Act." *Id.* at 31, 1990 U.S.C.C.A.N. at 1537. The Senate Report unequivocally states that the OWBPA, and the heightened protection required in group termination situations, were intended to "ensure[ ] that older workers are not coerced or manipulated into waiving their rights to seek legal relief under the ADEA." *Id.* at 5, 1990 U.S.C.C.A.N. at 1510.

The record reflects that Gerber did not attempt to "comply" with the OWBPA (if its April 2 Letter could be deemed an attempt to comply) until: (1) approximately two weeks after it was served with the present class action complaint; (2) over three months after the Notification of Termination and after the employees had executed the Release; and (3) after it had commenced paying its former employees severance under the Release.

According to Plaintiffs, Gerber's noncompliance is exactly the type of employer mis-

chief that the Supreme Court cautioned against in *Oubre*—the type of conduct that would not be tolerated under the strict statutory scheme of the OWBPA. As the *Oubre* Court observed, employers may be tempted "to risk noncompliance . . . knowing it will be difficult [for the discharged employee] to repay the monies" received under a defective release and thus bar, under a theory of ratification, the employee from suing. *Oubre*, —— U.S. at ——, 118 S.Ct. at 842. The Court refused to "open the door to an evasion of the statute by this device." *Id.*

The rationale employed by the *Oubre* majority expresses a strong public policy against permitting an employer, under any circumstances, to fail to comply with the statute and later attempt to "cure" its noncompliance through ratification. Whether Gerber's noncompliance was deliberate, as Plaintiffs contend, or innocent is irrelevant. To permit an employer to "cure" its mistake would be inconsistent with the public policy sought to be promoted by the OWBPA—the protection of older workers—and would serve to encourage employers to risk noncompliance as condemned by the *Oubre* decision.

**2. *Assuming Arguendo That the Release Could Be Cured, The April 2 Letter Is Also Invalid Under the OWBPA***

 Even if Gerber could cure the defective Release, its April 2 Letter is invalid to bar the instant ADEA claim since it too fails to comply with the stringent requirements of the OWBPA: the Letter neglected to provide additional consideration to the discharged employees, and it is deceptive in that it relied on the Release, which Gerber knew violated the mandate of the OWBPA.

One of the statutory prerequisites for a "knowing and voluntary" waiver is that "the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual

already is entitled. . . ." 29 U.S.C. § 626(f)(1)(D).[6]

It is undisputed that the April 2 Letter offers no additional consideration to an employee who signs it. It states that "if you want to continue to receive the additional pay and benefits being provided to you pursuant to the Release and Waiver, you should sign and date the Reaffirmation. . . ." The Letter concludes that the sole reason for a former employee to sign the Reaffirmation is "your own sense of right or wrong"—hardly additional consideration. Thus, the April 2 Letter does not comply with § 626(f)(1)(D) and cannot bar a claim under the ADEA.

Moreover, the April 2 Letter, under the facts at bar, cannot be "knowing and voluntary." In any dispute regarding whether the statutory requirements under the OWBPA have been met, "the party asserting the validity of the waiver shall have the burden of providing in a court of competent jurisdiction that a waiver was knowing and voluntary. . . ." 29 U.S.C. § 626(f)(3). Gerber cannot make this showing because the April 2 Letter is misleading.

First, the Letter fails to inform the discharged employees that in addition to reaffirming or revoking the Release, a third option exists: the employees could do nothing and continue to receive the benefits.

Second, nowhere in the Letter does Gerber inform the discharged employees that the information supplied is statutorily mandated under § 626(f)(1)(H). Further, the Letter does not inform those employees that the failure to include such information rendered the initial Release ineffective to bar an ADEA suit. Instead, Gerber relies on the defective Release in its April 2 Letter. The Letter confirms that the "initial acceptance of the [Release] is binding on both [the accepting employees] and the Company." Similarly, the March 31 Letter to Velkovich reiterates Gerber's position that the Release signed "is fair, binding and enforceable."

---

**6.** This section comports with common law contract principles that a promise supported by past consideration is unenforceable because the detriment did not induce the promisor; that is, since the detriment had already been incurred, it cannot be said to have been bargained for in ex-

change for the promise. *See Umscheid v. Simnacher*, 106 A.D.2d 380, 482 N.Y.S.2d 295 (2d Dep't 1984); *see also Roth v. Isomed, Inc.*, 746 F.Supp. 1467 (S.D.N.Y.1992) (general rule is that past consideration is no consideration).

Additionally, Gerber states in the April 2 Letter its belief that the Release is binding and that the reason for providing the information is because other former sales associates had "request[ed]" it. In view of the fact that Gerber's counsel acknowledged in court on March 14, 1998, that the Release did not comply with the OWBPA, Gerber's statement to the contrary in connection with the April 2 Letter renders it impossible for the April 2 Letter to be "knowing and voluntary." *See generally Griffin*, 62 F.3d at 373 (finding that "nonstatutory circumstances, such as fraud, duress, or coercion in connection with the execution of the waiver, may render an ADEA waiver not 'knowing and voluntary.'" (*citing* S.Rep. No. 101–263, at 31–32 (1990))).

Regardless, as discussed above, even if the April 2 Letter had met the OWBPA requirements, a second chance to comply is not permitted.

### V. *Plaintiffs' Motion To Strike Gerber's Third Separate Defense*

Gerber's Amended Answer proposes that the ADEA action cannot be maintained by those discharged employees who signed a valid waiver. The Third Separate Defense states that:

> One of the named plaintiffs, Daniel J. Velkovich, and virtually all potential class members have, in exchange for adequate and valuable consideration, executed waivers releasing any claims they may have had against Gerber Products Company.

Along with its motion for preliminary injunction, Plaintiffs moved to strike this defense of waiver pursuant to Fed.R.Civ.P. 12(f). As found above, the former employees who signed the Release have not waived their right to bring suit under the ADEA because the Release failed to meet the requirements of the OWBPA. The April 2 Letter does not alter that result. Therefore, because the question of whether there has been a valid waiver under the OWBPA was answered in the negative, Gerber's defense of waiver is stricken.

### Conclusion

For the reasons set forth above, Plaintiffs' motion for preliminary judgment is convert-ed into a motion for summary judgment, and summary judgment is hereby granted to Plaintiffs. In addition, Gerber's affirmative defense of waiver is stricken.

Gerber is granted leave to submit within 20 days hereof any evidence of additional material facts with respect to this grant of summary judgment and such a submission shall be considered a motion for reconsideration, in which event the Plaintiffs will have 10 days thereafter to submit answering evidence or opposition and the motion to reconsider will be deemed submitted within 30 days hereof unless the parties by stipulation provide a different submission schedule.

It is so ordered.