Carolyn BLACKWELL, et al.,
Plaintiffs–Appellants,

v.

COLE TAYLOR BANK and Cole Taylor Financial Group, Inc., Defendants–Appellees.

No. 97–3939.

United States Court of Appeals,
Seventh Circuit.

Argued April 22, 1998.

Decided Aug. 7, 1998.

Cynthia H. Hyndman (argued), Robinson, Curley & Clayton, Chicago, IL, Ronald Butler, Butler, Rubin, Saltarelli & Boyd, Chicago, IL, Cary S. Fleischer, Chuhak & Tecson, Chicago, IL, for Plaintiffs–Appellants.

Steven M. Levin, Levin & Perconti, Chicago, IL, Arthur L. Klein (argued), Michael A. Stiegel, Paul E. Starkman, Vito P. LoVerde,

Arnstein & Lehr, Chicago, IL, for Defendants–Appellees.

C. Gregory Stewart, Geoffrey L. Carter (argued), Equal Employment Opportunity Commission, Office of General Counsel, Washington, DC, for Amicus Curiae.

Before POSNER, Chief Judge, and CUMMINGS and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

The plaintiffs are five individuals who claim to have been constructively discharged by the defendant, their former employer the Cole Taylor Bank, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* The district court granted summary judgment for the bank on the ground that the plaintiffs had waived their right to bring an age discrimination suit. The plaintiffs have appealed, and the defendant both defends the district court's ground and argues in the alternative that the plaintiffs have no case on the merits.

■ When a worker within the class protected by the age discrimination law (age 40 and up) leaves his employment, it is common for the employer to try to obtain a waiver of the worker's right to bring a suit under that law. Such waivers are enforceable if they comply with the Older Workers Benefits Protection Act, an amendment to the ADEA that is codified at 29 U.S.C. § 626(f). The waiver law (as we'll call it) provides, so far as bears on this case, that "if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees," each employee must be "given a period of at least 45 days within which to consider the agreement" and also given detailed information concerning eligibility for the program and other factors bearing on an informed choice of whether to participate in it. §§ 626(f)(1)(F)(ii), (H). If the waiver is not requested in connection with an exit incentive or other employment termination program, only 21 days notice is required and no information about eligibility or other factors relevant to the employee's decision. § 626(f)(1)(F)(i). In either case the waiver must be supported by consideration to be enforceable. § 626(f)(1)(D).

■ The terms "exit incentive [program]" and "employment termination program" are not defined. The plaintiffs argue that the waivers they signed had been requested in connection with an exit incentive program, and we must decide whether there is enough evidence of this to have created a triable issue. They argue in the alternative that the waiver was requested in connection with an employment termination program, but we do not have to consider this argument. A straightforward interpretation of "employment termination program," supported by the legislative history, S.Rep. No. 263, 101st Cong., 2d Sess. 32 (1990), U.S. Code Cong. & Admin. News at 1509, 1537–38, and assumed in several cases, *Oberg v. Allied Van Lines, Inc.,* 11 F.3d 679, 682 (7th Cir.1993); *Raczak v. Ameritech Corp.,* 103 F.3d 1257, 1260–61 (6th Cir.1997); *Griffin v. Kraft General Foods, Inc.,* 62 F.3d 368, 371 (11th Cir.1995) (per curiam), is that an outright termination is merely the extreme case of creating an exit incentive. Although the word "offer" would be misplaced as a description of a discharge—and anyway the purpose of OWBPA is to assure that the worker has the leisure and the facts necessary to enable him to make a sensible choice, which implies that he *has* a choice rather than simply is being terminated—an employer will often couple the termination of a group of employees with a severance offer conditioned on a waiver of rights, and in such a case there is both offer and choice, though not a choice of whether to stay or leave. Another interpretation of the phrase "employment termination program" infers from the modifier "other" ("exit incentive or other employment termination program") that the phrase is meant to indicate that the employer's characterization of the program is not conclusive. If the program creates an incentive to leave, it is within the statute, even if it is not described in those terms. Cf. *Burch v. Fluor Corp.,* 867 F.Supp. 873, 877–78 (E.D.Mo.1994). The two interpretations are not mutually exclusive, and both seem correct.

The plaintiffs were five of the bank's seven branch managers; the other two were under 40 and so are not involved in the suit. In

March of 1995 the bank decided to eliminate the position of branch manager. It informed all seven of this decision at a meeting on March 14 and offered them a choice between what we'll call "new position" and "quit now." They could accept a new position of sales manager, on new compensation terms—a reduced salary but eligibility for a bonus if they achieved specified sales goals—that would take effect in three months. Their progress toward achieving the sales goals would be monitored monthly during the three-month period. And if they accepted the new position on these terms but then changed their mind and quit within the three-month period (that is, by June 15), they would be entitled to a severance payment, provided that they executed a waiver of their rights under the ADEA and other employment-discrimination statutes. If instead (choosing the "quit now" option) they resigned from the company by the next morning (that is, the morning of March 15), they would receive a month's salary, and if they signed the waiver within 21 days they would receive in addition to the month's salary the same severance payment they would have received had they accepted the new position. In other words, there was a bonus consisting of one month's salary for quitting immediately. Two of the plaintiffs took the quit-now option while the others, plus the two branch managers who were under 40, accepted the new position but changed their minds and quit during the three-month period that ended on June 15. All five plaintiffs signed waivers, and the question is whether the waivers satisfy the requirements of the waiver law. If so, this age discrimination suit is barred.

■ With respect to the plaintiffs who quit on March 15, we have an additional issue under the waiver law to decide: whether they received the 21 days notice to which they were entitled even if the waivers they signed were not requested in connection with an exit incentive or employment termination program. They did. It is true that they had less than a day to decide whether to quit, but they had the statutory minimum of 21 days within which to decide whether to sign the waiver in exchange for an additional severance payment.

The other plaintiffs had 90 days in which to accept the waiver without forfeiting a benefit, but they were not given the actual waiver form until they tendered their resignations and they had only 21 days after that to sign the waiver, not the 45 days that the statute requires when a waiver is requested in connection with an exit incentive program. 29 U.S.C. § 626(f)(1)(F)(ii). Nor did they receive the information that the waiver law requires of employers who request waivers in connection with such a program. So it is critical whether the new-position option was an "exit incentive ... program offered to a group ... of employees." We take it that "program" goes with "group or class," Congress having thought that recipients of the kind of standardized, often complex, take-it-or-leave-it severance offers tendered in connection with a reduction in force or other reorganization should have more time in which and information with which to decide whether to waive their ADEA rights than in the case of individually negotiated separations. S.Rep. No. 263, *supra*, at 32. The statute does not specify the size of the group or class, although the smaller it is, the less likely is the offer to the members to be pursuant to a program. Here the offer was to an entire class of employees, the branch managers, not to individuals, and the fact that there were only seven of them does not detract from the "programmatic" nature of the offer. As a matter of fact, the defendant concocted a rather elaborate program for restructuring its relation to these seven employees.

■ It is a factual question whether the program created an "exit incentive," cf. *Pullman–Standard v. Swint*, 456 U.S. 273, 289 and n. 19, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), though like all factual questions if it can be answered only one way then summary judgment is permissible. At one extreme would be an employer who told his older employees merely that he would pay each of them $1,000 in exchange for a waiver of any claims they might have under the age discrimination law that had accrued up to the date of the offer. The offer would create no incentive for the employees to resign and so the requirements of 45 days notice and de-

tailed information would not come into play. At the other extreme would be an employer who offered early-retirement benefits to his older employees and conditioned the offer on the employees' signing waivers. The offer would be an exit incentive program of which the request for waivers was an incident. Between these extremes lies a grey area illustrated by the present case, in which the question whether there was an exit incentive program presents a triable issue.

When your employer offers you money to quit within a few hours, you are likely to think that he would like you to leave; he is offering you money to leave which he is not obliged to offer you, for the bank made clear at argument that it had no contractual obligation to give a month's pay to an employee who quit or was fired on short notice. If the employer offers you as an alternative a substitute job which appears to involve a three-month probationary period during which you will be under constant scrutiny for attainment of performance goals, the inference arises—or so a trier of fact might find—that he is giving you a last chance to prove yourself, so that if you're not optimistic about your ability to prove yourself you will again construe the offer as an invitation to leave. The bank's lawyer admitted at argument that its client had not been satisfied with the performance of its seven branch managers and that that was why it had reconstituted their positions. When an employer tells you you're not doing an adequate job and gives you a choice of either quitting on the spot or "trying out" as it were for another job and offers you severance payments if you quit either now or within three months, it is creating—or so a trier of fact might rationally find—an incentive to quit.

■■■ The bank may have hoped that the program would frighten the seven branch managers into increasing their sales efforts to a level at which they would achieve the bank's sales goals and increase their own incomes above what they had been under the previous system of compensation. But an exit incentive program does not lose its character as such merely because the program may prod many of or even all the employees subject to it to stay on the job, only with

redoubled efforts. By raising the bar in a high jump you stimulate the contestants to greater effort but you also knock some, and eventually all but one, out of the contest. Remember that the statute has a separate provision for involuntary terminations, one that embraces, we may assume, constructive terminations—situations in which the employer, to force an employee to quit, makes working conditions unbearable for him. We base this assumption on the fact that the underlying statute, the Age Discrimination in Employment Act, applies to constructive as well as to express terminations. *Henn v. National Geographic Society*, 819 F.2d 824, 829–30 (7th Cir.1987); *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161–62 (2d Cir.1998); *Johnson v. Runyon*, 137 F.3d 1081 (8th Cir. 1998) (per curiam); *Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 733–34 (4th Cir.1996). An exit incentive is a lesser inducement, one that will shake loose a number of the leaves on the tree but is not intended to defoliate it completely. The "new position" option, especially in juxtaposition with the "quit now" option, could be found to constitute the requisite incentive (not compulsion) to resign.

■■■ So were it not for the defendants' alternative ground for affirming the judgment of the district court, we would have to remand for a trial on the issue of the validity of the waivers. But the alternative ground, which the plaintiffs had a full opportunity to contest in their reply brief, is solid. There simply is no evidence of age discrimination. The defendant abolished a job classification, that of branch manager, and replaced it with a more demanding one. Although some of the branch managers were 40 or older, others were not, yet all were subjected to the change and all decided to quit and the replacements included two persons in the protected class. There was evidence that the program was motivated by a concern that the branch managers were not "flexible" or "energetic," and the plaintiffs call these code words for "over 40," but it is a considerable insult to the tens of millions of workers in that age group to suppose that they are generally regarded as lacking in flexibility and energy. If "flexible" and "energetic" are to go the way of "fresh blood" and "you can't

teach an old dog new tricks" as words or sayings purged from the lexicon of personnel management because deemed evidence of age discrimination, supervisors will be rendered speechless in evaluating their subordinates. A maxim like "you can't teach an old dog new tricks" is objectionable as a form of stereotyping; it treats all "old dogs" alike. To evaluate an individual worker or a group of workers as lacking energy, initiative, commitment, imagination, flexibility, or other desired characteristics is not to indulge in age stereotypes, and is indeed the kind of evaluative approach that the antidiscrimination laws seek to encourage. These laws do not require the retention of dead wood.

The plaintiffs argue that the bank's claim that it abolished the branch-manager job classification because the branch managers weren't doing as good a job as the bank would have liked was a pretext, that is, a lie. But the issue of pretext does not arise in a discrimination case until the plaintiff has made out a prima facie case, which, in the absence of direct evidence of discrimination (of which there is none here, as we have just pointed out), is usually done by showing that a younger worker was treated better than an older worker who was qualified to do the work in question. *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1178–79 (7th Cir.1997). That was not shown here.

The statute does not require employers to preserve jobs, any more than it requires them to retain substandard workers. *Brownlow v. Edgecomb Metals Co.*, 867 F.2d 960, 964 (6th Cir.1989). If jobs are abolished by a reduction in force, or if job classifications are abolished, the workers competing to remain employed are in the same position as workers applying for a new job. *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir.1997). Older workers have no entitlement to preferential consideration for these jobs. Their only entitlement is not to be discriminated against on account of their age in the decision whether to hire them for the new job. The bank created a new job and offered it to the incumbents of the old jobs *whatever their age*, all of whom, again whatever their age, turned it down. The plaintiffs claim, we may assume correctly,

that they turned it down because it was a lousy, hopeless job. After they turned it down, the bank found other people willing to take this lousy, hopeless job, some of whom were younger than some of the plaintiffs. Since the job was the plaintiffs' for the asking, they can hardly complain that they were discriminated against when the job went to other, mostly younger people—it was a job the plaintiffs didn't want.

We may assume that if an employer deliberately, without legitimate business justification, reconfigured a job to make it inaccessible to older workers, perhaps by imposing age-linked qualifications irrelevant to the employer's actual needs (no wrinkles, perhaps), this would be unlawful age discrimination. Cf. *Johnson v. New York*, 49 F.3d 75, 77, 80 (2d Cir.1995); *EEOC v. Local 350*, 998 F.2d 641, 646 (9th Cir.1992). It would be a case in which the plaintiff presented direct evidence of the employer's maleficent intentions rather than asking that discrimination be inferred by the route that was mapped out in *McDonnell Douglas* and that has been applied to innumerable age discrimination cases illustrated by *Coco*. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1399 (7th Cir.1997); *Hill v. Metropolitan Atlanta Rapid Transit Authority*, 841 F.2d 1533, 1539 (11th Cir.1988); *Beaird v. Seagate Technology, Inc.*, 145 F.3d 1159, 1171–72 (10th Cir.1998). But there is no such evidence. And because disparate impact is not, at least in this circuit, a permissible theory of violation of the ADEA, *EEOC v. Francis W. Parker School*, 41 F.3d 1073, 1077 (7th Cir. 1994); see also *Ellis v. United Airlines, Inc.*, 73 F.3d 999, 1007 (10th Cir.1996); cf. *DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 732–34 (3d Cir.1995); *Lyon v. Ohio Education Ass'n*, 53 F.3d 135, 139 n. 5 (6th Cir.1995); but see *District Council 37 v. New York City Dept. of Parks & Recreation*, 113 F.3d 347, 351 (2d Cir.1997); *Smith v. Des Moines*, 99 F.3d 1466, 1469–70 (8th Cir.1996); cf. *Koger v. Reno*, 98 F.3d 631, 639 (D.C.Cir. 1996), the mere fact that the reconfigured job was less attractive to older than to younger

workers would not establish a violation even if the employer could have made it more attractive to older workers without undue hardship. The plaintiffs' case cannot get off the ground, and so was properly dismissed, though only because there is no evidence of age discrimination.

■ We have described this as an age discrimination case and so it mainly is; but one of the plaintiffs (Blackwell) also has a race discrimination claim. The waivers that the plaintiffs signed purported to waive the employee's rights under all employment-discrimination laws, including Title VII of the Civil Rights of 1964, on which Blackwell's claim of race discrimination is based. There is no counterpart in Title VII land to the Older Workers Benefits Protection Act, and so Blackwell's waiver of her claim of race discrimination was valid as long as it met the usual criteria for an effective waiver, that is, as long as it was knowing and voluntary. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 52 and n. 15, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Gibson v. Neighborhood Health Clinics, Inc.,* 121 F.3d 1126, 1129 (7th Cir. 1997); *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437–38 (2d Cir.1998). This produces the paradox that workers of age 40 and up who quit in response to a group offer receive more legal protection than members of minority groups who quit in response to such offers, unless the highly specific requirements of OWBPA are thought to codify the general concept of "knowing and voluntary," which is hardly plausible; the cases that we have just cited treat the concept as creating a standard rather than a ladder of quantitatively precise rules. And if standard it be, there is no indication that Blackwell's waiver failed to meet it.

■ Furthermore, in its brief in this court the bank argued that anyway there is no evidence of racial discrimination—and in their reply brief the plaintiffs do not discuss the issue. This is not a waiver (!), as we have explained in another case concerning the significance of not replying in a reply brief to an argument made in the appellee's brief. *Hardy v. City Optical, Inc.,* 39 F.3d 765, 771 (7th Cir.1994). Even an appellee's failure to file a brief is not deemed a confession of error. Fed. R.App. P. 31(c); 7th Cir.

R. 31(d). But silence about facts does constitute a waiver of the specific factual contentions made by the opposing party in a brief filed earlier. *Hardy v. City Optical, Inc., supra,* 39 F.3d at 771; *Jones for Jones v. Chater,* 101 F.3d 509, 513 (7th Cir.1996). These contentions of the defendant, if true, sink the race discrimination charge; the failure to contest them in the reply brief requires us to treat them as true.

AFFIRMED.