Dale CAMPBELL, Richard Carr, Michael Cimprich, Douglas Dauenbaugh, Lorene Duin, John Fraser, John Hadenfeldt, Ronald Heitmann, William Marcil, James Morgan, Charles Mueller, Robert Pepper, Bob Robertson, Kathy Solem, Darrell Williams, Larry Yoder, Roger Zink and Richard Zuber, Plaintiffs and Representatives for Class Members similarly situated,

v.

AMANA COMPANY, L.P., a limited partnership, and Goodman Holding Company, L.P., the general partner of Amana Company, L.P., Defendants.

No. C99–75 MJM.

United States District Court, N.D. Iowa, Cedar Rapids Division.

Jan. 4, 2001.

George F. Davison, Jr., Carla T. Schemmel, Glenn L. Norris, Hawkins & Norris, Des Moines, Iowa, David J. Darrell, E. Ralph Walker, Walker Law Firm, Des Moines, IA, for Plaintiffs.

Iris E. Muchmore, Simmons Perrine Albright & Ellwood, Cedar Rapids, IA, Neal S. Manne, Robert Rivera, Susman Godfrey, LLP, Houston, TX, for Defendants.

## OPINION and ORDER

MELLOY, District Judge.

The named Plaintiffs, Dale Campbell, et al., filed this suit as a potential class action pursuant to the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq., as amended by the Older

Workers Benefit Protection Act of 1990 (OWBPA), 29 U.S.C. § 626(f). (Doc. no. 1). Plaintiffs claim that the Defendants, Amana Company, L.P. and Goodman Holding Company, L.P., selected Plaintiffs to be fired in connection with a reduction in force solely on the basis of their age. Defendants deny any age discrimination, and alternatively assert that Plaintiffs signed a waiver releasing Defendants from all claims stemming from the termination, including the one brought in this Complaint.

Currently before the Court are the parties' cross-motions for partial summary judgment as to the validity and enforceability of the release. (Doc. nos. 12 and 29). Both parties contend that there are no genuine issues of material fact which would preclude summary judgment in their favor. Plaintiffs ask this Court to rule that the releases are unenforceable because they did not comply with the specific requirements of the OWBPA and/or they were signed under duress. Defendants argue that they are entitled to judgment as a matter of law because the releases complied with all statutory requirements and were voluntarily signed by Plaintiffs. Oral arguments on the cross-motions were heard on December 21, 2000.

*Summary Judgment Standard*

The standard for granting summary judgment is well-established. A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Montgomery v. John Deere & Co.,* 169 F.3d 556, 559 (8th Cir.1999); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quotation omitted*); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the "initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of genuine issue." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the opponent must go beyond the pleadings and designate specific facts—by such methods as affidavits, depositions, answers to interrogatories, and admissions on file—showing a material factual dispute. *See* Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

When presented with such a motion, the court must determine whether any factual issues exist that might reasonably be resolved in favor of either party and therefore must be submitted to the finder of fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Only disputes which might affect the outcome will properly preclude summary judgment. *See id.* at 248, 106 S.Ct. 2505.; *Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir.1992). The court must view the facts in the light most favorable to the nonmoving party, giving such party the benefit of all reasonable inferences to be drawn from the facts. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *St. Paul Fire & Marine Ins. Co. v. Federal Deposit Ins. Corp.,* 968 F.2d 695, 699 (8th Cir.1992). If the evidence of the nonmoving party is "merely colorable" or is "not significantly probative" summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. 2505. Thus, the nonmoving party need not provide direct proof that genuine issues of fact exist for trial, but the facts and circumstances that the nonmoving party relies upon must "attain the dignity of substantial evidence and must not be such as merely to create a suspicion." *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). In essence, the evidence must be "such that a reasonable jury could find a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Where, as here, the litigants concurrently pursue summary judgment, each motion must be evaluated independently to determine whether there exists a genuine dispute of material fact and whether the movant is entitled to judgment as a matter of law. *See Wermager v. Cormorant Township Bd.*, 716 F.2d 1211 (8th Cir.1983) ("[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary decision on the merits."); *A. Brod, Inc. v. SK & I Co., L.L.C.*, 998 F.Supp. 314, 320 (S.D.N.Y. 1998) (when faced with cross-motions, court must consider each motion independently, must in each instance view facts and draw all reasonable inferences in favor of nonmoving party, and is not required to grant summary judgment for either side); *see generally*, 11 James Wm. Moore et al., *Moore's Federal Practice* ¶ 56.10[6] (3d ed.1997). Thus, a cross-motion for summary judgment operates exactly like a single summary judgment motion.

### Background Facts

Defendants Goodman Holding Company, L.P. ("Goodman") and Amana Company, L.P. ("Amana") are in the business of manufacturing air conditioners and household appliances. In March 1997, Goodman started its due diligence regarding a possible acquisition of Raytheon Appliances, Inc., the predecessor to Amana. The transaction was completed in September 1997, with Goodman becoming the general partner of Amana. (Aff. Clifford J. Reilly, at ¶ 3). As general partner, Goodman determined that a reorganization was necessary to eliminate duplicate positions and that costs in certain aspects of Amana's business should be reduced through personnel layoffs. (Id. at ¶ 4).

On October 13, 1997, Amana terminated 132 people at its plants in Iowa, Arkansas, South Carolina and Tennessee. Defendants aver that these termination decisions were based on legitimate organizational needs and assessment of individual abilities, uninfluenced by age, race, or other improper bases. According to Defendants, each person selected for termination was individually informed of the decision by his or her direct manager. (Reilly Aff. at ¶ 10). After each individual was notified of the decision, all affected employees were asked to attend a group meeting at which severance packages were discussed. At that meeting, all terminated employees were asked to consider signing a release of any claims against Defendants in exchange for enhanced separation benefits. (Id. at ¶ 10).

The release tendered to the terminated employees included the following paragraphs:

5. Employee understands that he has the right to consult an attorney of his choice concerning this Release.

6. Employee understands that he may take at least 21 days to consider the Release and for a period of 7 days following execution of this Release, Employee may revoke the Release, and the Release shall not become effective or enforceable until the revocation period has expired.

The release clearly stated that claims under the Age Discrimination in Employment Act were covered by its terms. *See* Pl.'s Exh. A, "General Release," ¶ 1. Each Plaintiff signed the release within the 21 day period and accepted the enhanced separation benefits; none of the Plaintiffs chose to revoke the release within seven days of signing.

Plaintiffs filed this suit as a potential class action on May 27, 1999, alleging that the October 1997 terminations violated the ADEA. Therefore, a threshold determination must be made as to whether this age discrimination suit may proceed in light of the signed releases.

### Discussion

#### Validity of the Signed Releases

■ When a worker leaves his employment, it is common for the employer to try to obtain a waiver of the worker's right to bring a suit stemming from the termi-

nation. *See Blackwell v. Cole Taylor Bank,* 152 F.3d 666 (7th Cir.1998). In 1991, Congress enacted the OWBPA amending the ADEA to limit the manner in which an employee may waive the protections afforded under federal law. *See* 29 U.S.C. § 626(f) (1991); *Oberg v. Allied Van Lines, Inc.,* 11 F.3d 679, 682 (7th Cir.1993), *cert. denied,* 511 U.S. 1108, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994) (discussing effect of amendment). The Supreme Court, in *Oubre v. Entergy Operations, Inc.,* 522 U.S. 422, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998), addressed the effect of the OWBPA on federal age discrimination claims. *Oubre* held that where an employee signs a purported release of claims in return for an enhanced severance package, that release will not bar an ADEA claim unless it strictly complies with federal statutory requirements under the OWBPA. *See Oubre,* 522 U.S. at 424, 118 S.Ct. 838. At issue here is whether the release signed by Plaintiffs passes this strict-compliance test.

The OWBPA's statutory command is clear: "An individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary.... [A] waiver may not be considered knowing and voluntary unless at a minimum" it satisfies certain enumerated requirements. 29 U.S.C. § 626(f)(1), *quoted in Oubre,* 522 U.S. at 426–27, 118 S.Ct. 838. This imposition of precisely delineated affirmative duties on employers who seek releases of certain statutorily-created claims flows from Congress' policy decision to protect the rights and benefits of older workers. *See Oubre,* 522 U.S. at 427, 118 S.Ct. 838 (discussing legislative history and Congressional intent). To that end, "[t]he OWBPA governs the effect under federal law of waivers or releases on ADEA claims

and incorporates no exceptions or qualifications." *Oubre,* 522 U.S. at 427, 118 S.Ct. 838.

The statute imposes distinct duties of disclosure and waiting periods if the waiver is requested "in connection with an exit incentive or other employment termination program offered to a group or class of employees." *See* §§ 626(f)(1)(F)(ii), (H) [hereinafter, "subsections '(F)(ii) and '(H)"]. If a waiver is requested under either scenario, each employee must be "given a period of at least 45 days within which to consider the agreement" and also given detailed comparative data concerning eligibility for the program and other factors bearing on an informed choice of whether to participate in it. *See id.*[1] If the waiver is requested in any other situation, only 21 days notice is required and no information about eligibility or other factors need be given. *See* § 626(f)(1)(F)(i).

The terms "exit incentive [program]" and "employment termination program" are not defined, and the parties ardently dispute whether the October 1997 firings fall within that provision's penumbra. This dispute is critical to the parties' cross-motions as it may determine whether Plaintiffs' age discrimination suit can proceed. It is undisputed that Defendants provided no comparative data to the terminated employees and gave them only 21 days within which to consider signing the release. Therefore, if the releases were requested "in connection with an exit incentive or other employment termination program offered to a group or class of employees," they fail to satisfy the statutory requirements and cannot bar the Plaintiffs' age discrimination claim. If the terminations were not in connection with such a program, then the suit may proceed only if

---

1. Subsection '(F)(ii) specifically provides that "if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement." 29 U.S.C. § 626(f)(1)(F)(ii).

Subsection '(H) specifically provides that "if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees," then the employer must give the employee specified written information regarding those eligible and/or selected for the program. 29 U.S.C. § 626(f)(1)(H).

the Court concludes that the releases were nevertheless invalid under other provisions of the statute or that they were signed under duress.

A. *Did the October 1997 terminations constitute an "exit incentive or other group termination program" under the OWBPA"?*

■ Since it is undisputed that Defendants did not comply with the OWBPA provisions provided under §§ 626(f)(1)(F) and (H), Defendants must explain why compliance with these subsections is not required in this case. *See* 29 U.S.C. § 626(f)(3);[2] *Oberg*, 11 F.3d at 682; *Raczak v. Ameritech Corp.*, 103 F.3d 1257, 1262 (6th Cir.1997) ("The OWBPA places the onus of proving a knowing and voluntary waiver squarely on defendants."). The Court will assume for purposes of analysis that under subsections '(F)(ii) and '(H) an "exit incentive program" is one which contemplates a voluntary reduction in force.[3] However, the additional statutory protection imposed by those subsections also applies to "other group termination programs" and it is that term which forms the gravamen of this dispute.

■ As noted above, the statute does not define the term "employment termination program." Defendants make several arguments as to why a proper reading of the statute results in a conclusion that Defendants' October 1997 termination of 132 employees was not such a program. First, Defendants assert that the additional requirements under '(F)(ii) and '(H) apply only to employment terminations programs *"offered* to a group or class of employees." 29 U.S.C.

§ 626(f)(1)(F)(ii) and (H) (emphasis added). Defendants argue that the October terminations were not optional and thus not "offered" as that word is intended under the statute. Therefore, Defendants conclude, the additional requirements were not triggered. Second, the additional data required by subsection '(H) refers to those "eligible to participate" and must include information regarding the "class, unit, or group of individuals covered by such program" including "eligibility factors" and any "time limits applicable to such program." Defendants assert that the Amana employees who were terminated on October 13, 1997 were not "eligible" to participate in a program based on any "eligibility factors;" instead, their employment was terminated based on departmental needs and comparative rankings made by decentralized department managers. Defendants further argue that the required disclosure of "applicable time limits" under subsection '(H)(i) demonstrates that the provision is aimed only at plans equivalent to voluntary early retirement programs, where eligible individuals must elect to participate and retire within a specified time period. And finally, Defendants argue that even if subsections '(F)(ii) and '(H) apply to involuntary reductions in force generally, there is at least a material factual dispute as to whether those provisions apply to the reduction in this case. For reasons to be discussed herein, the Court concludes that neither the legislative history nor the plain language of the statute will support the narrow reading and application proposed by Defendants.

**2.** Section 626(f)(3) provides:

In any dispute that may arise over whether any of the requirements, conditions, and circumstances set forth in subparagraph[s] [ (A)–(H) ] of paragraph (1) ... have been met, the party asserting the validity of the waiver shall have the burden of proving ... that a waiver was knowing and voluntary pursuant to paragraph (1) or (2).

**3.** While this Court agrees that under the most natural reading of the statute, the October

1997 waiver requests were not in connection with an "exit incentive program," other courts have taken a different approach and determined that the term can encompass even an involuntary reduction in force. *See, e.g., Blackwell*, 152 F.3d at 669 (concluding that "[a] straightforward interpretation of 'employment termination program,' supported by the legislative history, and assumed in several cases, is that an outright termination is merely the extreme case of creating an exit incentive") (internal citations omitted).

1. The legislative history supports additional protection for large-scale involuntary reductions.

Contrary to Defendants' contention that the additional statutory protection of subsections '(F)(ii) and '(H) applies only where the employees' exit or termination is in some manner optional, the legislative history, quoted below at some length, clearly reflects Congressional contemplation that those provisions would apply equally to involuntary termination programs, such as that at issue in this case.

> In the context of ADEA waivers, the Committee recognizes a fundamental distinction between individually tailored separation agreements and employer programs targeted at groups of employees. Individual separation agreements are the result of actual or expected adverse action against an individual employee. The employee understands that the action is being taken against him, and he may engage in arms-length negotiation to resolve any differences with the employer.
> Group termination and reduction programs stand in stark contrast to the individual separation. During the past decade, in particular, employers faced with the need to reduce workforce size have resorted to standardized programs designed to effectuate quick and wholesale reductions. The trademark of involuntary termination programs is a standardized formula or package of employee benefits that is available to more than one employee. The trademark of voluntary reduction programs is a standardized formula or package of benefits designed to induce employees voluntarily to sever their employment. In both cases, the terms of the programs generally are not subject to negotiation between the parties. In addition, employees affected by those programs have little or no basis to suspect that action is being taken based on their individual characteristics. Indeed, the employer generally advises them that the termination is not a function of their individual status. Under these circumstances, the need for adequate information and access to advice before waivers are signed is especially acute.

S.Rep. No. 101–263, 101st Cong., 2d Sess. 32 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1537–38. *See also Suhy v. AlliedSignal,* 44 F.Supp.2d 432, 434 (D.Conn.1999) (applying '(F)(ii) and '(H) to RIF of 40 employees, the court stated, "While the language of the OWBPA provides little guidance as to the contours of what constitutes an employment termination program offered to a group or class of employees, the legislative history of the OWBPA provides clear guidance as to whether [Defendant's] reduction in force was part of such a program."); *Blackwell,* 152 F.3d at 670 ("Congress having thought that recipients of the kind of standardized, often complex, take-it-or-leave-it severance offers tendered in connection with a reduction in force or other reorganization should have more time in which and information with which to decide whether to waive their ADEA rights than in the case of individually negotiated separations.").

Although this circuit has not addressed the issue, other courts have construed the OWBPA's inclusion of "other group termination program[s]" to encompass reductions in force, determining that such a construction is in accord with the legislative history. *See Raczak,* 103 F.3d at 1260–61 (applying "employment termination program" requirements to involuntary terminations selected in conjunction with complex classification of employees based on assessments of their job performance); *Oberg,* 11 F.3d at 682 (finding that "sixty plus employees terminated at one time satisfies OWBPA's definition of a group termination"); *Suhy,* 44 F.Supp.2d at 432 (finding subsections '(F)(ii) and '(H) applicable to termination of forty employees in connection with reduction in force); *Butcher v. Gerber Prods. Co.,* 8 F.Supp.2d 307, 315 (S.D.N.Y.1998) (finding no dispute that mass discharge (over 300 employees) on one day "constitutes an 'employee termination program' under the OWBPA"); *Burch v. Fluor Corp.,* 867 F.Supp. 873

(E.D.Mo.1994) (finding term applicable to termination of four employees constituting twenty-five percent reduction in force); *Jennings v. Doe Run Co.*, 866 F.Supp. 428 (E.D.Mo.1994) (same). In fact, this Court has been unable to find, nor have Defendants proposed, a single case in which a large-scale reduction in force was deemed exempt from the additional affirmative duties of subsections '(F)(ii) and '(H).

2. The plain language does not preclude application of subsections '(F)(ii) and '(H) to large-scale involuntary reductions.

As already discussed, the legislative history strongly refutes Defendants' contention that subsections '(F)(ii) and '(H) do not cover purely involuntary reductions in force. The statutory language equally belies any such interpretation. Defendants argue that because the statute expressly states that subsections '(F)(ii) and '(H) apply only to "exit incentive or other employment termination programs *offered* to a group or class of employees," those provisions cannot cover involuntary reductions such as that at issue here. However, the most natural reading of "exit incentive *or* other employment termination programs" in subsections '(F)(ii) and '(H) is that Congress intended to include both voluntary ("exit incentive") and involuntary ("other employment termination") programs within its protection. To construe the statute otherwise would be to completely disregard the phrase "or other group termination program." *See Burch*, 867 F.Supp. at 877 (declining to adopt employer's "somewhat strained reading of the statute and the legislative history," and noting that "the juxtaposition of the terms 'exit incentive' and 'other employment termination program' indicates that the universe of other programs includes non-incentive programs"); *Blackwell*, 152 F.3d at 669 ("Another interpretation of the phrase 'employment termination program' infers from the modifier 'other' . . . that the

phrase is meant to indicate that the employer's characterization of the program is not conclusive."). And while the word "offer" may arguably be misplaced as a description of an involuntary termination, "an employer will often couple the termination of a group of employees with an enhanced severance offer conditioned on a waiver of rights, and in such a case there is both offer and choice, though not a choice of whether to stay or leave." B*lackwell*, 152 F.3d at 669; *accord, Burch*, 867 F.Supp. at 877 (noting that "plain language of the statute does not require that a termination program offer employees an incentive or inducement to leave the company's employ").

As to the detailed disclosure specifications under subsection '(H), the Court finds unavailing Defendants' argument that such language demonstrates Congressional intent not to accord additional protection to the situation at issue here.[4] Defendants contend that because the termination selection process was decentralized and individualized, there were no "eligibility factors" for selection, no "class, unit, or group of individuals" were targeted by the reduction, nor were there any "applicable time limits" as described in subsection '(H). Again, in light of the clear legislative history to the contrary, the Court disagrees with Defendants' attempt to narrowly restrict the statutory language. Even if, as Defendants assert, a methodical, careful plan was put in place to ensure that the transition and layoffs would proceed in a nondiscriminatory manner, that goes to the merits of the age discrimination claim, not to the issue of whether the releases were valid. Congress was concerned with an employee's ability to evaluate, in group termination situations such as this, whether he or she should risk the loss of a potential cause of action in return for enhanced severance benefits. *See Blackwell*, 152 F.3d at 670 ("Congress having thought that recipients of the kind of standardized, often complex,

4. Subsection '(H)(i) requires that if applicable, the employer must inform the individual in writing as to "any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program."

take-it-or-leave-it severance offers tendered in connection with a reduction in force or other reorganization should have more time in which and information with which to decide whether to waive their ADEA rights than in the case of individually negotiated separations."); *Long v. Sears Roebuck & Co.*, 105 F.3d 1529, 1534 (3d Cir.1997) ("The problem is particularly acute in large-scale terminations and layoffs, where an individual employee would not reasonably be expected to know or suspect that age may have played a role in the employer's decision, or that the program may be designed to remove older workers from the labor force.") (quoting S.Rep. No. 101–79, at 9 (1989), and adopted by reference in S.Rep. No. 101–263, at 15 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1508, 1520). Without the comparative information mandated by subsection '(H), an employee cannot make an informed decision as to whether the nondiscrimination asserted by Defendants is true. *See Suhy*, 44 F.Supp.2d at 436 ("The principal difficulty encountered by older workers in these [group termination and exit incentive program] circumstances is their inability to determine whether the program gives rise to a valid claim under the ADEA.") (quoting S.Rep. No. 101–263, at 67 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509).

3. No genuine issues of material fact preclude summary judgment in this case.

Defendants alternatively contend that even if this Court determines that subsec-

tions '(F)(ii) and '(H) apply to reductions in force generally, whether they apply to this reduction in force presents a genuine issue of material fact precluding summary judgment in Plaintiffs' favor. Defendants cite *Blackwell* for the proposition that it is a fact question whether, in a particular instance, a group termination program exists so as to trigger the additional affirmative statutory duties. *See Blackwell*, 152 F.3d at 670 ("It is a factual question whether the program created an 'exit incentive'. . . ."). While this general proposition is correct, the *Blackwell* court went on to clarify that "like all factual questions[,] if it can be answered only one way then summary judgment is permissible." *Id.* Assuming that *Blackwell's* "exit incentive" analysis can be generalized to an "other employment termination" analysis, its facts could not be farther from those at issue in this case.[5] *Blackwell* involved a bank reorganization in which seven branch managers were given a choice between quitting now with enhanced benefits in return for a waiver, or accepting a new sales position, on a potentially less favorable commission salary basis. *See id.* at 669–70. The court determined that while the bank may have hoped that the offer would frighten the seven employees into increasing their sales efforts, the "quit now" option could be found to constitute an incentive to resign. *See id.* at 671. Because either inference was reasonable, the court held that summary judgment would not be appropriate on the release validity issue. *See id. Blackwell* thus holds that between the

5. In contrast to the 132 terminations at issue in the present motion, *Blackwell* involved only seven employees. As noted in the Court's discussion, *supra*, Defendants do not cite, nor has this Court's independent research found, a single published case in which a court found even a genuine issue of material fact as to whether subsections '(F)(ii) and '(H) apply to large-scale reductions in force. Although many courts have merely assumed as much, *see, e.g., Griffin v. Kraft Gen. Foods, Inc.*, 62 F.3d 368, 373 (11th Cir.1995) (finding no dispute that closure of one plant triggered additional affirmative duties, and proceeding directly to sufficiency of compliance); *Butch-*

*er*, 8 F.Supp.2d at 315 (conceding that discharge of over 300 employees on one day is "employment termination program" and proceeding directly to sufficiency of compliance), those courts that have directly addressed the issue at the summary judgment stage have found in favor of the plaintiffs. *See, e.g., Oberg*, 11 F.3d at 682 (finding noncomplying release invalid where requested in connection with reduction of over sixty employees); *Suhy*, 44 F.Supp.2d at 435 (same regarding reduction of forty employees); *Burch*, 867 F.Supp. at 877–78 (same regarding 25% reduction in force); *Jennings*, 866 F.Supp. at 431 (same regarding 25% reduction in force).

clear cases to which subsections '(F)(ii) and '(H) do or do not apply, there "lies a grey area," in which the question whether there was an exit incentive program presents a triable issue. *See id.* With regard to the present motion, however, there are no factual grey areas and thus no triable issues.

Here, 132 employees, fired on or about the same day, attended a group meeting at which they were offered a choice between standardized severance packages. Those willing to sign a release of potential claims would receive an enhanced package; those unwilling would not. The Court rejects Defendants' attempt to argue that because these employees theoretically could have individually negotiated with Defendants regarding the terms of their severance package, there is a *Blackwell* factual issue as to whether subsections '(F)(ii) and '(H) apply. Neither the language nor policy of the OWBPA will rationally support such a conclusion. If compliance with the additional disclosure and waiting periods of the Act could be so easily evaded, those provisions would be meaningless. As the legislative history and the Supreme Court in *Oubre* make clear, Congress made a policy decision to protect older workers' rights to bring federal age discrimination claims. The need for protection is no lesser, and arguably may be greater, where the terminations are involuntary than where they are offered in conjunction with a voluntary early retirement program. *See Griffin v. Kraft Gen. Foods, Inc.*, 62 F.3d 368, 373 (11th Cir.1995) (reviewing legislative history and so concluding).

In the present suit, it is undisputed that the terminations were part of a reduction in force and there is no indication that Plaintiffs were not performing at an adequate level prior to the reduction. *See*

*Suhy*, 44 F.Supp.2d at 435 (applying factor analysis to find reduction in force governed by § 626(f)(1)(H)(ii)). Standardized severance packages were presented in a group meeting targeted at those terminated in the reduction. *See id.* An enhanced severance package was offered in return for a release of potential claims, including ADEA claims. *See id.* (listing cases in accord). There is no indication of individualized negotiation by any employees with regard to terms of their severance packages.[6] *See id.* These facts support only one conclusion: the releases signed by Plaintiffs were requested "in connection with an employment termination program offered to a group or class of employees," and must therefore strictly comply with the OWBPA, including subsections '(F)(ii) and '(H). Because it is undisputed that those provisions were not complied with, the releases cannot bar Plaintiffs' ADEA claim.

Finally, the Court notes Defendants' objection that granting Plaintiffs' motion for summary judgment would lead to an illogical result. Defendants contend that even after examination of the comparative data, Plaintiffs will be unable to demonstrate statistical proof to support their disparate impact claim, and will then bring instead a case focused on highly individualized inquiries regarding the reasons why each was selected for layoff. Defendants would be foreclosed from offering the Release as a defense to the individualized claims, even though the Release fully complies with the OWBPA's requirements where individually-negotiated terminations are at issue.

The Court finds nothing illogical about such a scenario, which, if it occurs, would be entirely of Defendants' own making. It

---

**6.** There is no evidence in the record to support Defendants' assertion at oral argument that each of the 132 terminated employees was free to individually negotiate severance terms, and the programmatic nature of the offer strongly suggests the contrary. *See Blackwell*, 152 F.3d at 670 (finding the "programmatic nature" of the offer significant to determination of OWBPA applicability even

though program offered to only seven employees). Thus, Defendants' conclusory allegation is insufficient to raise a genuine issue of material fact on this point. *See Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) ("An issue of material fact is genuine if it has a real basis in the record.") (citing *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348).

would not be uncommon for an employee to bring causes of action under alternative disparate impact and treatment theories, and there is no reason to presume that Congress had not considered as much when enacting the OWBPA. *See Howlett v. Holiday Inns, Inc.,* 120 F.3d 598, 602 (6th Cir.1997) ("The overarching purpose of the OWBPA amendment is to provide employees with information giving them 'the ability to assess the value of the right to sue for a possibly valid discrimination claim.' ") (quoting *Raczak,* 103 F.3d at 1262). It follows then that it is the circumstances surrounding the termination and waiver request that govern the disclosure requirements, not the theory of recovery that is ultimately asserted. Had Defendants fully complied with the statutory requirements for waivers requested in connection with group termination programs, then presumably both avenues of relief would be cut off. Where, as here, Defendants failed to do so, the consequences of that failure are not only logical but were also foreseeable and avoidable. *See Howlett,* 120 F.3d at 602 ("[A]s a practical matter, we note that the 8 OWBPA requirements should not be difficult for an employer to meet.").

### Conclusion

The Court finds that there are no genuine issues of material fact which preclude summary judgment as to the validity and enforceability of the releases signed by Plaintiffs in connection with their termination from Defendants' employ on October 13, 1997. Because the Court concludes that the releases were requested in connection with "an exit incentive or other group termination program offered to a class or group of employees," Defendants were required to strictly comply with the additional disclosure and extended waiting period provisions mandated by the OWBPA. *See* 29 U.S.C. 626(f)(1)(F)(ii) and (H). It is undisputed that Defendants failed to

so comply, and therefore Plaintiffs did not knowingly and voluntarily sign the releases under the ADEA. *See* 29 U.S.C. § 626(f)(1). Accordingly, the releases must be deemed invalid and unenforceable with regard to the age discrimination claim brought in this suit.[7]

### ORDER

For the reasons discussed herein, it is ordered:

Plaintiffs' motion for partial summary judgment (doc. no. 12) as to the invalidity of the release under the Older Workers' Benefit Protection Act, 29 U.S.C. § 626(f), is GRANTED. Defendants' parallel motion (doc. no. 29) is DENIED.

---

**7.** Because Defendants' failure to comply with subsections 626(f)(1)(F)(ii) and (H) renders the Releases unenforceable against Plaintiffs' federal age discrimination claim, the Court need not determine whether, as Plaintiffs assert, the Releases were also invalid for failure to adequately advise employees to consult an attorney, *see* 626(f)(1)(E), or because they were signed under duress.